**COLORADO TAXPAYERS UNION, INC.,** Colorado Libertarian Party, Mary Lind, David Aitkin, Vern Bickel, Pasquale Francomano, Clyde Harkins and Basil R. Walton, Jr., Plaintiffs.

v.

**Roy ROMER, individually, and as Governor of the State of Colorado, Citizens for Representative Government, Phil Fox, Clark Shaw, and Does 1 through 20, Defendants.**

Civ. A. No. 88–M–1818.

United States District Court, D. Colorado.

Oct. 31, 1990.

Kathleen Curtis, Fort Collins, Colo., for plaintiffs.

Maurice G. Knaizer, First Asst. Atty. Gen., Denver, Colo., for Governmental defendants.

Gerald A. Caplan, Alan J. Canner, Boulder, Colo., for Non-governmental defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The plaintiffs in this civil action publicly proposed adoption of a citizen initiated amendment to the Colorado Constitution by the electorate in the 1988 general election. That proposal, Amendment 6 on the ballot, was publicly opposed by the incumbent Governor, Roy Romer, and the defendant organization, Citizens for Representative Government, of which Phil Fox and Clark Shaw were members. The plaintiffs seek relief under 42 U.S.C. § 1983, claiming that Governor Romer violated their rights protected by the First Amendment to the United States Constitution by the use of state resources and the power and prestige of his office to advocate defeat of Amendment 6. They also assert that the Governor and the other defendants combined in a conspiracy to violate the plaintiffs' constitutional rights, contrary to 42 U.S.C. § 1985(3) and common law. Legal issues have been presented on cross motions for summary judgment.

### I. Standing

■ The defendants deny the plaintiffs' standing to bring this action, arguing that because the plaintiffs could vote, associate, speak out, and petition in the 1988 election, they were not harmed by the Governor's activities against the amendment. The defendants also contend that the Colorado Libertarian Party has no claim because it is a political party whose primary purpose is to elect candidates, not pass initiatives.

The plaintiffs have alleged sufficient injury for standing. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82

L.Ed.2d 556 (1984) ("plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief"); *see also Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98, 98 S.Ct. 2620, 2643, 57 L.Ed.2d 595 (1978) (to assert standing, individual must show that he has suffered or will incur some injury in fact that is both distinct and palpable). This challenge to governmental action as an unconstitutional interference with the First Amendment rights of supporters of a citizen initiative presents " 'a claim of present objective harm or a threat of specific future harm.' " *Meese v. Keene*, 481 U.S. 465, 472, 107 S.Ct. 1862, 1866, 95 L.Ed.2d 415 (1987) (quoting *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)); *see also Common Cause v. Bolger*, 512 F.Supp. 26, 30 (D.C.D.C.1980) (candidates challenging incumbents were injured by congressional franking privilege and therefore could show sufficient injury in that franking forced challengers to raise additional funds). In a similar case, this court held that voter-taxpayers had standing to challenge the actions of a school board in opposing an amendment to the state constitution. *See Campbell v. Arapahoe Cty. Sch. Dist. No. 6*, 90 F.R.D. 189, 192 (D.Colo.1981), *aff'd*, 704 F.2d 501 (10th Cir.1983). The issues are not moot because the same plaintiffs are proponents of another initiative, Amendment 1, on the 1990 general election ballot in Colorado.

The claimed injury is traceable to the defendants' activities. *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. at 3324; *see also Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). The harm consists of the additional burden imposed on the plaintiffs by the defendants' allegedly unconstitutional acts. Like the plaintiffs in *Common Cause v. Bolger*, the plaintiffs here have alleged that their campaign for Amendment 6 would not have been so difficult (and, in fact, might have been successful) but for the defendants' acts.

The Colorado Libertarian Party is a qualified political organization under Colorado law. *See* C.R.S. § 1–1–104(17). The statute defines "political organization" as "any group of registered electors who, by petition for nomination of an independent candidate as provided in section 1–4–801, places upon the official general election ballot nominees for public office." Nothing in the statute prohibits a political organization from supporting a citizen initiative. The defendants have produced nothing to contest the allegations that the plaintiff organizations, including the Colorado Libertarian Party, represent people supporting Amendment 6 in 1988 and Amendment 1 in 1990. Accordingly, both the individual and organizational plaintiffs have standing to challenge the defendants' actions in the 1988 election.

## II. First Amendment

■ The Colorado Constitution affirms that "[a]ll political power is vested in and derived from the people; all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." Colo. Const. Art. II, § 1. The people of Colorado have "reserve[d] to themselves the power to propose laws and amendments to the [state] constitution and to enact or reject the same at the polls independent of the general assembly.... The veto power of the Governor shall not extend to measures initiated by ... the people." Colo. Const. Art. V, § 1; *see also Colorado Project—Common Cause v. Anderson*, 495 P.2d 218 (Colo.1972) (recognizing importance of initiative to exercise of people's political power). In striking down a Colorado statute that had prohibited the use of paid petition circulators in initiative campaigns, the United States Supreme Court recognized that this right to initiate laws implicates the First Amendment "at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425, 108 S.Ct. 1886, 1894, 100 L.Ed.2d 425 (1988). Although the Governor possesses "the supreme executive power of the state," Colo. Const. Art. IV, § 2, that power is only what has been delegated by the people who retain their sovereignty. The

Governor has no official role to play in the consideration of a constitutional amendment proposed by an initiative. *Rocky Ford v. Brown*, 133 Colo. 262, 293 P.2d 974, 975–76 (1956) (city attorney could not advise city council prior to election that ordinance proposed by initiative would be invalid).

The essence of the plaintiffs' position is that when the Governor becomes an advocate against a citizen initiative, he has exceeded the limits of his official power and interfered in the process by which the people exercise their sovereign right to change the authority of the officials who govern them. The principle that public funds collected from taxation may not be used to support opposition to an initiated measure was recognized in *Mountain States Legal Fdn. v. Denver Sch. Dist.*, 459 F.Supp. 357, 360–61 (D.Colo.1978), where this court said that

> [a] use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgement of those fundamental freedoms. Specifically, where the proposal in question—placed before the voters in the exercise of the initiative power—seeks fundamentally to alter the authority of representative government, opposition to the proposal which is financed by publicly collected funds has the effect of shifting the ultimate source of power away from the people.... Publicly-financed opposition to the exercise of that right contravenes the meaning of both the First Amendment to the United States Constitution and Article V, Section 1 of the Constitution of Colorado.

*See also Campbell v. Arapahoe Cty. Sch. Dist.*, 90 F.R.D. 189 (D.Colo.1981); *Stanson v. Mott*, 17 Cal.3d 206, 130 Cal.Rptr. 697, 704, 551 P.2d 1, 8 (1976) ("every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper"); and *Citizens to Protect Public Funds v. Board of Education*, 13 N.J. 172, 98 A.2d 673, 677 (1953) ("[t]he public funds entrusted to the board belong equally to the proponents and opponents of the proposition").

This is not a public expenditure case. Almost all of the outlay involved in the Governor's campaign against Amendment 6 was reimbursed by Citizens for Representative Government and the few remaining out-of-pocket incidental expenses identified by the plaintiffs are *de minimis*. Although the plaintiffs allege that members of the Governor's staff devoted state-paid time to the anti-Amendment 6 campaign, they offer no proof of time actually spent on such activity. The plaintiffs contend that reimbursement of expenses of the Governor's anti-Amendment 6 campaign was not curative because the state effectively "loaned" its resources in violation of Article XI, section 1, of the Colorado Constitution, which prohibits the state from lending or pledging its credit. That particular claim is not properly before this court in this action under 42 U.S.C. § 1983. Jurisdiction in this case is limited to violations of Federal law.

The plaintiffs argue that the Supreme Court recognized that elections may be unduly influenced by institutional power in *Austin v. Michigan Chamber of Commerce*, ⎯ U.S. ⎯, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). There, the Court denied the contention that a Michigan statute prohibiting contributions from business corporations to campaigns for elective office violated any rights protected by the First Amendment. The Court concluded that the state legislature had shown a sufficiently compelling governmental interest in avoiding possible corruption of the elective process by business organizations possessing economic power developed through favorable state laws. In contrast, the defendants rely on *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) to claim First Amendment protection for their opposition campaign. There, the Supreme Court voided a Massachusetts statute prohibiting business corporations from contributing to initiative and referendum campaigns, unless the issue in the campaign affected the "business, property, or assets of the corporation." *First National Bank*

*of Boston v. Bellotti,* 435 U.S. at 768, 98 S.Ct. at 1411. The Court was unsympathetic to the argument that corporate speech would "exert an undue influence on the outcome of a referendum vote," since there had been no showing of such influence in the election. *Id.* at 789, 98 S.Ct. at 1422. The Court noted that " 'the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.' " *Id.* at 790–91, 98 S.Ct. at 1423–24 (quoting *Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 648–649, 46 L.Ed.2d 659 (1976)).

Reconciling these two opinions is difficult. Neither case is controlling here. Fundamental principles of constitutional law must not depend upon subjective judgments about the relative power of participants in public debate to influence the electorate. The First Amendment does not have an egalitarian function. It may not be used to equalize an imbalance of resources or to increase or diminish the persuasive power of the competitors for public support. The protection it grants is freedom *to* speak; not freedom *from* conflicting speech. The objective is to preserve a free market for ideas. *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) ("the best test of truth is the power of the thought to get itself accepted in the competition of the market").

The plaintiffs protest the content of Governor Romer's presentations, claiming that he misrepresented material facts and treated Amendment 6 with contempt. In *Brown v. Hartlage,* 456 U.S. 45, 60, 102 S.Ct. 1523, 1532, 71 L.Ed.2d 732 (1982), the Supreme Court recognized the chilling effect on political debate that would follow any effort to require accuracy or to prohibit hyperbole and colorful phrasing.

The plaintiffs also contend that the Governor infringed upon their rights by assisting in organizing and orchestrating the campaign against Amendment 6 and by pressuring business organizations to contribute money and influence to the opposition. Fear of unspecified "reprisals" is said to be the method. The plaintiffs have provided no evidence of any violation of any federal or state law or regulation by the Governor or his allies.

The fundamental flaw in the plaintiffs' contentions is the failure to distinguish between governmental interference with an initiative and opposition to it from persons occupying positions in government. There is a difference between the conduct of public officials in speaking out on controversial political issues and their use of governmental power to affect the election. Coercion is the core of power in government. Whether that coercion is applied directly through compulsory or prohibitory laws or indirectly through taxation and expenditure, the use of that power is limited by constitutional controls, including the First Amendment. These limitations on power are not restrictions on the freedom of elected officials to participate in the debate of public issues. The Governor is a political personage. His powers of persuasion are attributes of his personality as well as his position. When those personal powers are not linked to the levers of the coercive authority of the government he heads, there is no governmental interference with the First Amendment rights of those opposing him on an issue.

The plaintiffs contend that the Governor's use of a state owned airplane, automobile, and security personnel are inappropriate. While government funds are involved, these expenditures are incidental. They enhance and extend the reach of the political person; increasing his opportunity to perform his official duties and to communicate with people. These traditional perquisites are merely enlargements of the political personage which are not separable from the man in office. The official position is a part of the person of the incumbent at all times. Governors have no duty shifts or time off.

### III. The Conspiracy Claim

■ The plaintiffs allege a conspiracy under 42 U.S.C. § 1985(3) and common law. The section 1985 claim is barred due to the plaintiffs' failure to demonstrate any class-

based animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1272 (10th Cir.1989).

The only common law conspiracy claim within the federal question jurisdiction of this court is a conspiracy to violate the plaintiffs' First Amendment rights.

The plaintiffs have failed to show anything more than some combination of efforts to persuade the electorate to reject Amendment 6. That is not an unlawful goal. The plaintiffs have also failed to show the use of any unlawful means to reach that goal. There is no showing of support for the conspiracy claim.

Upon the foregoing, it is

ORDERED that the plaintiffs' motion for summary judgment is denied, and it is

FURTHER ORDERED that the defendants' motions for summary judgment are granted, and this civil action is dismissed.